AR:jd

**Eugene A. WAHL and Vibra Screw Feeders, Inc., Plaintiffs,**

v.

**CARRIER MANUFACTURING CO., Inc., Defendant.**

**Civ. A. No. NA 63–C–19.**

United States District Court
S. D. Indiana,
New Albany Division.

Oct. 16, 1968.

Orbison, Rudy & O'Connor, New Albany, Ind., Pennie, Edmonds, Morton, Taylor & Adams, New York City, for plaintiffs.

Charles C. Fox, Jeffersonville, Ind., Mann, Brown & McWilliams, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STECKLER, Chief Judge.

### Findings of Fact

96. Defendant commenced the manufacture and sale of Auger-Vibra Portioner (AVP) feeders in February, 1963, shortly before this action was commenced and defendant has continued without interruption the manufacture and sale of AVP feeders (P-34).

97. At the first trial in June, 1964, the only AVP feeder illustrated in defendant's sales literature was placed in evidence, as P-11, by plaintiffs and the making, using or selling of P-11 feeders was held to infringe claims 14, 15 and 17 of the patent in suit (Carrier Dep. Ex. 1).

98. Prior to the time of the first trial, defendant discontinued the manufacture and sale of devices identical with the P-11 feeders and commenced making and selling AVP feeders different in some structural respects from the P-11 feeder. The specific structure of these feeders was not then known to plaintiffs during the first trial, nor were such structures brought to the attention of the Court by the defendant (P-34; D-T). Mr. Carrier testified at the first trial that the P-11 feeder was bolted down in some instances (transcript of first trial pp. 155–67).

99. On March 23, 1965, a judgment including an injunctive provision was entered and on April 20, 1965, defendant moved to suspend the injunction. The motion was granted and the injunction was suspended during the appeal period from June 11, 1965 to July 7, 1966.

100. In support of its motion for suspension of the injunction, defendant represented to the Court that the suspension was urgently needed to prevent irreparable damage to defendant's business pending the appeal, this representation being made though defendant had stopped making and selling P-11 feeders.

101. The Court of Appeals for the Seventh Circuit affirmed this Court's findings of fact (1–95) and the conclusions of law (1–6) in an opinion dated March 9, 1966.

102. In April, 1966, nearly two (2) years after the first trial, and more than one year after entry of the judgment, defendant filed a petition to clarify the judgment or alternatively for a declaratory judgment of non-infringement of its AVP feeders different in any respect from the P-11 feeder.

103. During the early part of the discovery period prior to the second trial, plaintiffs accepted defendant's invitation to witness a demonstration of defendant's AVP feeders described in defendant's petition, and on November 15, 1966, plaintiffs' Chief Engineer, Cornelius DeBonte, and plaintiffs' attorneys witnessed the operation of those two AVP feeders at defendant's Jeffersonville plant (T536–8; 558; D-P, Q, R and S).

104. One of the feeders demonstrated at defendant's Jeffersonville plant was equipped with a $\frac{1}{16}''$ stroke vibrator. The fact that no feeders with $\frac{1}{16}''$ strokes were ever sold and shipped by defendant was later discovered by plaintiffs (P-33a, 33b and 34; T552–3).

105. Defendant built the $\frac{1}{16}''$ feeder demonstrated to plaintiffs specially for that purpose and feeders having the stroke of this demonstration feeder have never been sold by defendant (D-P; T553).

106. Defendant's AVP feeders, not identical to the P-11 feeder and illustrated on the blueprints of D-T (hereinafter referred as Ex. T feeders), perform the same function and are sold for the same purpose as the P-11 feeder and the patented feeder (T34–7; P-10).

107. Defendant's Ex. T feeders which vary in tube diameter from one to fourteen inches are in all instances sold as metering devices to provide for accurate feeding of hard-to-handle materials within one or two percent error (T34–5; P-34).

108. All defendant's Ex. T feeders use the inventive concept of the Wahl in-

vention and operate on the same principle as plaintiffs' patented feeder (T244–6; P-10). The concept of the Wahl invention is to vibrate the trough, tube and screw of the feeder to reduce the material to a constant bulk density (Findings Nos. 36 and 72) and cause the screw to run full. The screw vibration must be sufficient to prevent sticking of the material to the screw surfaces and to assure complete emptying of the screw at the discharge end (T760). This is necessary in order for the feeders to perform the function of accurate metering of materials. Defendant's Ex. T feeders use the Wahl concept in that the material in the feeder is reduced to a constant bulk density by vibration of the tube and screw, the screw runs full, and the amplitude of vibration of the screw is sufficient to prevent sticking of the material to the flights of screw so that the feeders accomplish the metering function.

109. Since the tube and screw together form the walls of the measuring chambers, the vibration of both tube and screw contributes to reducing the material to a constant bulk density. Ex. T feeders which are bolted to large heavy structures may have screws which would vibrate insufficiently to achieve constant bulk density for some materials if tube vibration were not also present; however, in all Ex. T feeders, screw and tube vibration together accomplish constant bulk density for each and every material fed.

110. Defendant's sales Bulletin No. 110 (P-19) used to promote the sales of Ex. T feeders is essentially the same as the Bulletin No. 110 (Carrier Dep. Ex. 1) which was used to sell the P-11 feeder. Both bulletins state that the requirements of precise feeding which the AVP feeders satisfy are:

"1. Uniform bulk density of material

2. Constant speed of the feeding device

3. Consistently controlled volume."

111. The later Bulletin No. 110 differs from the earlier Bulletin No. 110 only in that the later includes a photograph of an Ex. T feeder instead of a photograph of the P-11 feeder and reference is made to the fact that a Whirlpool or a stationary hopper may at the customer's option be purchased with the feeder. Both Bulletins read in part as follows:

"The Auger-Vibra Portioner is a new and unique concept in combining a vibrating feeder and a screw feeder into a vibrating screw feeder. This machine will accurately meter flows of powder materials, granules, flakes, including chemicals, food products, etc."

\* \* \* \* \* \*

"It is a method of feeding bulk materials by volume with accuracy approaching that achieved by a scale. Normally feed rate accuracies for most bulk materials are held within ±1 to 2% accuracy with the Auger-Vibra Portioner. Where accuracies in this range are satisfactory the Auger-Vibra Portioner is a more economical control instrument than a continuous scale."

\* \* \* \* \* \*

"This combination of vibration and auger movement assures an even, gentle handling without any degradation of the material."

112. Each Ex. T feeder uses the Wahl invention in that its trough and tube are mounted for vibration which vibration is transmitted through the feeder itself and through the material being conveyed to vibrate the screw for achieving, together with tube vibration, constant and controlled agitation of the material, the screw running full and the proper emptying of the screw at the discharge end (T248; 723; 769–70).

113. "Simultaneous" as used in the specification of the patent in suit means "at the same time" and does not require that the trough, tube and screw vibrate as a unit (P-1, 11; opinion of Court of Appeals).

114. The directions of movement of the tube, trough and screw of the patented feeder is not significant in the opera-

tion of the patented feeder, proper functioning being obtained if sufficient amplitude of vibration of the screw is obtained in any direction (T761–2).

115. The proper functioning of defendant's Ex. T feeders requires reducing the difficult-to-handle material having a varying density to a uniform bulk density to permit accurate gravimetric feeding of the material (T36, 236).

116. The required amount of deliberate and controlled vibration of the screw in feeders capable of use in accordance with the Wahl invention varies with the type of material being handled (T197) and plaintiffs' tests with its variable stroke patented feeder revealed that at about 1800 cycles per minute amplitudes of vibration as low as a few thousandths are sufficient to accomplish proper metering with some materials (T197–8; 739).

117. The vibration of the end portion of the screw of plaintiffs' and defendant's feeders is substantially greater in planes perpendicular to the axis of the screw than in planes passing through the axis of the screw (T205), and the amplitude of vibration of the central portion of the screw lying within the tube is substantially larger than the amplitude of movement of the end portions (T204, 248).

118. Instrument vibration readings were taken at the end portions of the screws of two (2) Ex. T feeders installed for commercial operation in defendant's customer plants both on isolators and bolted to supporting structures; the amplitude readings taken radially (perpendicular to the screw axis) of these feeders were in the range of .040–.070 inches (T105–6, 124–6; P-40, 42). This range of vibration is approximately two to three times the vibration of the screw of the P-11 feeder (Finding No. 69).

119. The axial screw vibration readings taken on the numerous Tennessee Eastman feeders at Kingsport, Tennessee, when converted into a radial reading by multiplying by a factor of four, Mr. Wahl's approximation of the ratio of radial-to-axial readings on this type of

feeder (T205), provide screw vibration readings of .008 to .020 for most of the feeders measured (T678–683).

120. There are two paths of vibration from the vibrator of the Ex. T feeder to its auger, the vibrator serving to deliberately and controllably vibrate the screw through each path (T187–91). One path of transmission is through the feeder itself to the screw. This path of vibration is the same as the path utilized by the P-11 feeder as proven at the first trial and demonstrated when the feeder was operated without material in it. The second path is from the vibrated tube enveloping the material through the material to the screw (T187–9).

121. The amount of vibration reaching the screw of the Ex. T varies depending on the type of the material being fed, the structure to which the feeder is mounted, and the amount of vibration being produced by the vibrator, and in each Ex. T feeder the amount of screw vibration is sufficient to accomplish the metering function (T36, 236).

122. The source of screw vibration from the feeder base was demonstrated at the first trial and the source of vibration through the material was suggested to the Court by plaintiffs' counsel at the oral argument after the first trial [Findings Nos. 65–68; transcript of oral argument (pp. 45–6)]. No evidence was adduced at the first trial relating to the fact of transmission of vibration through the material to the screw.

123. A demonstration feeder made by plaintiffs having features similar to a large number of Ex. T feeders sold to the Tennessee Eastman Company, was operated in the courtroom. The important features of similarity are the length of screw, the thickness of metal from which the screw was made, the screw diameter, the stroke of the vibrator, the angle between the vibrator arm and the tube and the clearance between the tube and screw (T834–7). The courtroom demonstration showed that vibration was transmitted from the vibrator to the

screw, significant vibration being measured on the screw when the feeder was run empty and when run with each of the different materials that were fed (T833, 865, 927; P-50, 51). The vibration readings measured radial to the axis of the screw for each material fed were (T927):

| Material Fed | Amplitude of Vibration (In Inches) |
|---|---|
| Plastic Pellets | .035 – .040 |
| Salt | .025 |
| Flour | .007 |
| Sand | .025 |
| Talc | .006–12 (high and low speed) |
| No material (feeder run empty) | .006 |

124. The amount of vibration reaching the screw through the material is less in the demonstration feeder (P-50) than it would be in the Ex. T feeders used at Tennessee Eastman for the reason that the removal of a large portion of the tube prevents the tube from running full, as it normally would, thus reducing the amount of material which surrounds the screw to provide vibration transmission to the screw (T918–9) and for the reason that the removed section of the tube cannot transmit any vibration to the screw (T923).

125. The operation in the courtroom of the vibrator of a Firestone feeder (P-46) with the feeder tube substantially filled with flour demonstrated that vibration was transmitted from the tube to the screw of the feeder to cause the screw to vibrate .040 of an inch at a point one-third the distance from the rear supporting bearing (T233–4).

126. Vibration readings taken at the ends of the screw of an Ex. T feeder installed on isolators and operating in the Firestone Tire and Rubber Company plant in Pottstown, Pennsylvania and readings taken on another Ex. T feeder bolted down to a supporting structure in an American Cyanamid plant in Hannibal, Mo. establish that the eccentric vibrator, and not any vibration outside the feeder, is the source of the vibration that is transmitted to the screw. The readings at Hannibal, Mo. show that the screw was vibrating 0.40 inch in one direction while the supporting structure was only vibrating 0.20 inch in that same direction (T135–6; P-40, 42 and 43).

127. The vibrator of the Ex. T feeders * is mounted on the base and is directly connected to the tube to vigorously vibrate the tube 125 to 250 or more thousandths of an inch (dependent upon the stroke of the vibrator); the amount of vibration transmission through the material to the screw and the amount through the base to the screw being dependent on the materials being handled, the ratio of weights of feeder parts and the mounting of the feeder (T265, 300–1).

128. The Ex. T feeders shown in T-19 and T-26 have their vibrators mounted between the hopper and the base which is supported on isolators to vigorously vibrate both the hopper and base and these feeders operate substantially in the same manner as the patented feeder P-10 in that the trough, tube and screw are substantially vibrated as a unit (T19, T26, L-1; 486, 748).

129. Where Ex. T feeders are bolted to relatively large structures, such as

---

* Except the two feeders shown in T–19 and T–26 (illustrated on L–1).

concrete and steel plate floors, the base vibration may be reduced as compared with feeders having isolators, but the vibration of the tube is still vigorous enough to provide effective transmission of forces of vibration from the tube through the material to the screw (T187–9, 205, 302–3, 677–86). The vibration on the screw of defendant's feeders is effective vibration since such vibration is required to accomplish the accurate metering function performed by its feeders (T723, 759–60, 769–70).

130. The screw of the Ex. T feeder, like the P-11 feeder, is indirectly vibrated in that the screw is not directly connected to the vibrator, but is positioned within the tube and the material being conveyed to permit and foster its vibration by indirect means (T187–9; D-T).

131. The intended vigorous vibration of the tube of the Ex. T feeder at a controlled constant amplitude causes the screw to be deliberately and controllably vibrated (T740, 52, 756–8).

132. Some Ex. T feeders were shipped to Tennessee Eastman by defendant without isolators and were installed in Tennessee Eastman's plant with rubber isolators placed between the base plates and the supporting structure (T179–80).

133. Defendant's Ex. T feeders whether placed on their supporting surfaces using isolators or using bolts without isolators or using both isolators and bolts have sufficiently active vibrators to indirectly vibrate their screws (T106, 124–5, 205, 677–86).

134. Plaintiff and defendant continue to be the only companies which sell screw feeders capable of performing the metering function described in the patent in suit and defendant's sales literature (Finding No. 58; T76–7).

135. The Wahl patent claims are entitled to be construed broadly in view of the invention's meritorious contribution to the art and its wide acceptance by industry as a unique feeding device (Findings Nos. 53, 58, 85 and 87; T76–7).

136. The Ex. T feeder infringes claim 14 of the Wahl patent because it performs substantially the same work in substantially the same manner to accomplish the same result as the patented P-10 feeder (T34–36).

137. Each of defendant's Ex. T feeders include each and every element of claim 14 of the patent in suit including a vibrator mounted on the feeder to deliberately and controllably cause the auger to vibrate by causing vibration impulses to be transmitted from the vibrator through the feeder base to the auger and by vibrating the tube which in turn transmits vibration through the material to the auger (T235–8; 187–8).

138. The presence or absence of hoppers or isolators on defendant's AVP feeders does not alter the function of the feeder which is to meter accurately dry materials nor does claim 14 of the patent in suit include either a hopper or an isolator (T245–6; P-1, 19).

139. The useful work performed by the vibrating screw includes shaking material from the screw flights located at the discharge end to completely empty the screw as well as to agitate the material to a constant bulk density (T769, 783, 788). Vibration of the screw also keeps the material from sticking to the flights of the screw which is an important aspect of the metering function of the invention.

140. Minor structural differences between the Ex. T feeder and the P-11 feeder do not affect the manner in which the metering function is accomplished (T245–6).

141. The reduction in the weight of the material containing hopper mounted on the base of an Ex. T feeder as the material is conveyed out of the hopper does not materially affect the controlled vibration transmitted to the screw since the weight of the entire system is also reduced (T764–6).

142. Each Ex. T feeder which is shipped by defendant without isolators is capable of being operated in the same

**1270**

manner as P-11 by mounting the feeder on isolators (T169, 179–80).

### Conclusions of Law

7. Defendant's petition for a clarification of judgment or alternatively for a declaratory judgment of non-infringement is dismissed.

8. The structure and principle of operation of the Ex. T feeders is substantially the same as the structure and principle of operation of the P-11 feeder.

9. Defendant's making, using or selling of the Ex. T feeders infringes claim 14 of the patent in suit.

10. The manufacture and sale of the Ex. T feeders infringes claim 14 of the patent in suit for the additional reason that the feeders are capable of being installed and operated in an infringing manner.

11. Plaintiffs are entitled to an accounting for damages resulting from defendant's past infringement, together with interest and costs.

12. If any above finding of fact should have been included herein as a conclusion of law or if any conclusion of law should herein have been included as a finding of fact, it is intended that such finding or conclusion be treated as if it had been properly included either as a finding or a conclusion.

### SUPPLEMENTAL JUDGMENT

This Court having filed on March 23, 1965, Findings of Fact (1–95), Conclusions of Law (1–6) and a judgment; defendant having subsequently filed a petition for a clarification of that judgment or, alternatively, for a declaration of non-infringement of certain feeders made and sold by it; the Court having heard all evidence presented, the issues having been briefed and argued and additional Findings of Fact (96–142) and Conclusions of Law (7–12) having been filed; the Court having concluded that certain feeders infringe claim 14 of the patent in suit, and the Court having concluded that the judgment herein be supplemented,

It Is Hereby Ordered, Adjudged and Decreed:

1. That defendant's petition for a clarification of judgment or, alternatively, for a declaratory judgment of non-infringement is dismissed;

2. That claim 14 of the Wahl patent No. 2,800,252 has been infringed by the defendant by its manufacture, use and sale of Powder-Feeding Apparatus designated as Ex. T feeders and by its active inducement of its customers to use said apparatus;

3. That the plaintiffs, Eugene A. Wahl and Vibra Screw Feeders, Inc. recover from defendant, Carrier Manufacturing Co., Inc. for its infringement of said Letters Patent No. 2,800,252, relating to its manufacture, use and sale of Ex. T feeders, all damages according to law from July 23, 1957, the date of issue of Patent No. 2,800,252; and

4. That Eugene A. Wahl and Vibra Screw Feeders, Inc. recover from defendant, their costs and disbursements in the proceedings relating to defendant's petition for a clarification of judgment or, alternatively, for a declaratory judgment of non-infringement.